**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RYAN BURFORD,** | **)** | |
| **Mr. Buford,** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 3:21-cv-279** |
| | **)** | **Judge Trauger/Frensley** |
| **STATE OF TENNESSEE** | **)** | |
| **Respondent.** | **)** | |

## REPORT AND RECOMMENDATION

In 2013, a jury convicted Mr. Buford Ryan Buford of first degree (felony) murder, especially aggravated robbery, and tampering with evidence. *Tennessee v. Buford*, No. M2014-01265-CCA-R3-CD, 2015 WL 9488975, at * 7 (Tenn. Crim. App. Dec. 29, 2015),[1] *perm. appeal denied*, (Tenn. May 6, 2016). Mr. Buford was sentenced to life imprisonment. *Id*. Having sought relief in state courts, Mr. Buford has filed a petition for a writ of habeas corpus under 28 § U.S.C. 2254. Docket No. 1. In his petition, Mr. Buford argues he received ineffective assistance of counsel at both the trial and appellate levels. *Id*. He has also requested this Court grant him an evidentiary hearing on these claims. *Id.* at pp. 33-34.

For the reasons that follow, the Court will recommend Mr. Buford's petition be denied. Further, the undersigned recommends that Mr. Buford's request for an evidentiary hearing also be denied.

## I.      BACKGROUND

The Tennessee Court of Criminal Appeals summarized the factual background of the case as follows:

The victim, Jose Martin Moya Torres, was shot to death after Tara Adcock, a

---

[1] The LEXIS reporter citation is *Tennessee v. Buford*, No. M2014-01265-CCA-R3-CD, 2015 Tenn. Crim. App. LEXIS 1049 (Dec. 29, 2015).

codefendant in the case, arranged to meet him for a "date" and to have him robbed by her associates, including the defendant. The defendant and the three co-defendants all gave statements to the police. In his statement, the defendant acknowledged that he was the shooter.

Prior to trial, the defendant's attorney moved to suppress his statement. The transcript of the hearing is not a part of the appellate record, but the trial court's order denying the motion summarized the testimony of the two witnesses, Detective Harold Haney and the defendant. Detective Haney testified that the defendant and co-defendant Ewing Green, IV, as well as their friend Trammell Wilson, were involved in a traffic accident as they fled police. The defendant and Mr. Green continued to flee on foot after the collision. However, the two later voluntarily appeared at the North precinct. Detective Haney testified that the defendant was advised of his rights, did not appear to be under the influence, and that he looked at, read, and signed the waiver. Detective Haney asked the defendant if he was under the influence, and the defendant replied that he had been under the influence earlier because he had "smoked a little weed." The defendant testified that he was seventeen at the time of the interview. He had been interviewed by police before. The defendant testified that at the time, he was taking Xanax "bars" and smoking marijuana habitually. He would take Xanax multiple times a day and would experience black outs, memory loss, and hallucinations. The defendant testified that he had no memory of being at the North precinct and no memory of the interview. He recalled going to school, taking Xanax, and riding in the car with his friends, and he recalled nothing else prior to waking in juvenile custody. He testified that his confession was not knowing or voluntary because he was under the influence of Xanax and marijuana. The recorded interview also reveals that Detective Haney asked the defendant at the beginning of the interview if he was shaking because he was nervous, and the defendant responded that he was anemic and cold.

The trial court concluded that the defendant's statement was knowing and voluntary. The trial court found there were no allegations of coercion and that the atmosphere of the interview was calm. The defendant was given a soda and crackers and the opportunity to have a break. The trial court found that the defendant was of above-average intelligence and able to read and write. He had been interviewed by police before and was familiar with the criminal justice system. He read and verbally acknowledged that he understood his rights. He signed the waiver. The defendant manifested concern about whether he was going to jail, the charges he would be facing, and his bond. The trial court found that "[t]he defendant was not under the influence of any intoxicants at the time of the waiver," citing the defendant's statements during the interview that he was not under the influence of intoxicants but had been earlier in the day. During part of the recorded video, the defendant was left in a room with Mr. Green and Mr. Wilson. He made several incriminating statements to his friends. The trial court found that his discussion with his friends showed that he was "fully competent, and he understood the purpose of the interview."

The defendant's attorney moved to withdraw after the motion to suppress was denied. The defendant was appointed a new attorney. Apparently, relations with his new attorney also deteriorated, and the defendant's family hired an attorney close to the time of trial. Appointed and retained counsel worked together to represent the defendant at trial.

Tara Adcock was the only co-defendant to testify for the State. Ms. Adcock was charged with the same crimes as the defendant, and she testified that she had not been promised anything in exchange for her testimony, although she had been told that her truthful testimony would be "considered." She had also been presented with a "use immunity agreement," in which the State had agreed not to use any statement she made during her interview with the prosecution against her unless she testified differently during trial. Ms. Adcock testified that she was thirty-eight at the time of the crimes and had been a prostitute for thirteen years to support a crack addiction; she had numerous convictions related to drugs and theft. Ms. Adcock and her girlfriend, LaShonda Williamson, had at one point both gone through a recovery program and had not used drugs or resorted to prostitution for four years. Two months prior to the crime, Ms. Adcock and Ms. Williamson both relapsed.

Ms. Adcock testified that Mr. Green was her drug dealer at the time and that she owed him two hundred dollars on the day of the homicide. Ms. Adcock and Ms. Williamson lived in a house where numerous other people, including Mr. Green and Ms. Williamson's nephew, periodically stayed. Ms. Adcock had known Mr. Green for two months, but she only met the defendant the day before the crime. On March 28, 2011, Ms. Adcock, Ms. Williamson, Mr. Green, the defendant, Ms. Williamson's nephew, and Jeremy "Chaw" Johnson were at the house, and they were discussing "anybody that we knew that had money and drugs so we could rob them." Around 2:00 p.m., Ms. Adcock and Ms. Williamson left the house to buy crack. After making the purchase, they noticed they had a flat tire.

At this time, the victim was working at a service station about five miles from the location of the homicide. When Ms. Adcock and Ms. Williamson pulled in, the victim fixed their tire, even though they did not have any money. Ms. Adcock discussed getting in touch with the victim when he got off work "so we could have sex and I could get some money." She acknowledged they did not specifically discuss money. They exchanged phone numbers.

Jose Luis Rodriguez, the owner of the service station, testified that the victim had worked there for five years. On the day of the victim's death, two women in a dark blue Buick had come to the shop with a flat tire. One of the women was Caucasian; Mr. Rodriguez later identified Ms. Adcock as the Caucasian woman. The other woman was African–American and "looked strong," "like a boy." The victim changed their tire, and they said they would return with money. They did not return, but they contacted the victim to have him change a fog light. Mr. Rodriguez intended to assist the victim in changing the fog light, but by the time the victim

and Ms. Adcock made contact, Mr. Rodriguez needed to go to his second business. The victim gave Mr. Rodriguez a ride around 7:30 p.m. When the victim dropped Mr. Rodriguez off, he said he intended to go get gas in the area near the homicide. Also around this time, the victim called his uncle, Antonio Gutierrez, to say that he was going to check a car for a friend. The victim told Mr. Gutierrez that he might be slightly late to watch the 9:00 p.m. television show that the two habitually watched together.

Ms. Adcock testified that she did not intend to prostitute herself but instead intended to rob the victim. She and Ms. Williamson discussed the robbery in the car, and when she got back to the house, she told Mr. Green, the defendant, Mr. Wilson, and Ms. Williamson's nephew "that I met somebody we could rob and we'd just have to wait on him to call." She testified that they "all thought it was a good idea." Ms. Adcock testified that the defendant and Mr. Green had guns and that she had seen the guns "[a]ll day." The plan for the robbery was for the victim to follow her to a dead-end road, and then the defendant and Mr. Green "were going to run up on him."

When the victim called her, Ms. Adcock told him to meet her at a gas station so he could follow her home. Ms. Adcock was driving a gold Nissan Maxima, and she rolled down the window at the gas station and told the victim to follow her. Instead of driving to her home, however, she drove down a dead-end road nearby. She turned around at the dead-end and then parked the car. The victim parked behind her. Ms. Williamson had meanwhile driven the defendant and Mr. Green in a white car to a nearby church parking lot.

Ms. Adcock got out of the Maxima to talk to the victim, telling him to wait until the neighbors were not looking. At that point, the defendant and Mr. Green ran up. Ms. Adcock got back in her car. Through the mirror, she saw that the defendant and Mr. Green had pulled the victim out of his car and were beating and kicking him. They had guns in their hands and black bandanas around their faces. Ms. Adcock testified that she saw the defendant point his gun and fire one time. The victim got up and started to run toward the back of his car. The defendant then fired another shot. Mr. Green got in the victim's car, and the defendant came into the back seat of Ms. Adcock's car. Back at the house, the defendant gave Ms. Adcock a wallet and cell phone. Mr. Green suggested burning the victim's car. Ms. Adcock, who rode in the victim's car with Mr. Green on the way to burn the car, threw the victim's possessions out of a window on the road. Ms. Williamson and the defendant drove to the same location in the white car. Mr. Green used a gas can to pour gas on top of the car and in the front seat, and he lit a fire. Afterwards, the four stopped by a hotel and, later, a tobacco store. Ms. Adcock was waiting in the car when the defendant came out of the tobacco store. She asked him "why he did the stuff he did," and he responded "that he felt better that he dreamed about it."

Ms. Adcock admitted to orchestrating the crime and doing it for financial gain. She acknowledged that it was dark during the robbery and that the defendant and Mr.

Green had their faces covered. She also acknowledged having told police that she heard the shots but did not see them. Ms. Adcock admitted that she did not want her girlfriend to get into trouble and that she was barely acquainted with the defendant and had no allegiance to him. However, she testified at trial that Mr. Green and the defendant did not look alike or have the same haircut and that she was certain the shooter was the defendant. Ms. Adcock also acknowledged that she had lied to investigators numerous times.

Larry Rutter lived on the dead-end street where the victim was shot. Around 8:00 p.m., he heard three gunshots, first one and then two quickly following each other. He opened the door and saw a man lying in the street, yelling for help. The man had a gunshot wound, and when Mr. Rutter asked the man who had shot him, the man told him it was "black guys." Mr. Rutter saw two vehicles leaving as he walked out the door. One was champagne-colored. He was only able to see the tail lights of the other. Richard Prince, who also lived on the street where the victim was shot, heard three to four gunshots. He saw the victim lying on the street at the head of his driveway. The victim was rolling around and told Mr. Prince that his name was Martin. Mr. Prince's daughter-in-law called 911.

Officer Keith McNamara and Officer Gene McCollum arrived on the scene and found the victim writhing in pain. The victim told them that "two black guys" had shot him. Officer McNamara testified that the victim said he was running away and did not see the men at the time that he heard the three shots. The victim also told Officer McNamara that his mother's car, a silver Solara, had been stolen by the shooters. Officer McCollum testified that the victim stated his wallet was also taken. Area police were alerted to be on the lookout for the victim's car. Officer McCollum found three shell casings in the street.
Later that night, the victim died in a hospital despite efforts to save him. The medical examiner, Dr. Feng Li, testified that a bullet entered the victim's lower back near the midline, damaged a major blood vessel and the large and small intestines, as well as the spine, and exited his body through the abdomen. The victim also suffered abrasion wounds to his flanks, arms, and legs. Dr. Li concluded that the manner of death was homicide.

The next morning, Officer Joe Pennington went to an area where he knew that vehicles were sometimes abandoned. He saw the victim's car, covered in soot on the inside and partly burned. Officer Johnny Lawrence processed the vehicle at the scene. Officer Lawrence saw liquid runoff at the top of the car and was able to retrieve some fingerprints from the outside. Both men testified that video cameras in the area were not functioning at the time the car was abandoned. Detective Russell Thompson also testified that he attempted to locate video of the destruction of the car but that he was unable to do so.

Detective William Kautzman, the lead investigator, testified that a witness happened to recognize Ms. Adcock, and after Mr. Rodriguez also identified her, police went to her home on March 29, 2011. Ms. Adcock, Ms. Williamson, Ms.

Williamson's nephew, and Mr. Johnson were at the home. When police first arrived, Ms. Adcock told them that she knew why they were there. She elaborated, "You're looking for the guy that shot that guy. He's inside." Lieutenant William Dyer likewise testified that Ms. Adcock was identified by an unnamed witness and that when police arrived, she said, "he's inside, he's inside." Mr. Johnson was arrested for an unrelated offense. Police searched the home pursuant to Ms. Adcock's consent. A dark blue Buick was parked at the home. Lynette Mace, who documented the scene and collected evidence, testified that one of the tires on the Buick was different from the other three. Detective Kautzman testified that several bullet casings were discovered. Ms. Mace collected six 9 millimeter casings from an area next to a shed on the property. The casings were of the same brand as the casings at the crime scene. Ms. Mace also collected a different caliber round from a trash can. A rifle which was not involved with the crimes against the victim was also collected.

Ms. Adcock and Ms. Williamson were interviewed by police several times. As a result, Detective Thompson also went on March 30, 2011, to an address where Mr. Green lived, and he brought Mr. Green in to be interviewed. Mr. Green was interviewed twice that afternoon but was released. Detective Kautzman testified that all the co-defendants initially made statements to the police that turned out not to be true.

Police searched the residence of Ms. Adcock and Ms. Williamson a second time on March 30, 2011. Ms. Mace testified that a box containing nineteen live rounds of 9 millimeter Winchester ammunition was discovered in a kitty litter box. One round was also found behind a couch. A plastic bag on a closet shelf had forty live rounds of 9 millimeter Winchester ammunition. Ms. Mace was able to collect fingerprints from the Winchester box.

Lieutenant Dyer testified that after Mr. Green was interviewed, the two women were interviewed again. At this point, they implicated themselves and others. Accordingly, on March 30, 2011, police were looking for a gold Nissan Maxima with temporary tags. Lieutenant Dyer observed a vehicle consistent with this description. After following the vehicle a short time, he turned on his emergency equipment. Rather than stopping, the vehicle accelerated. Eventually, it ran head-on into an SUV. The driver and front-seat passenger of the Maxima fled on foot and were able to elude officers. A third passenger, Mr. Wilson, was taken into custody. Officer Kenneth Wolfe came to collect evidence and document the scene. He testified that a 9 millimeter Smith & Wesson gun was found in the car. He acknowledged that the photographs documenting the scene reveal that two cellular phones and the temporary license plate appear to have been moved while he was still documenting the evidence.

At approximately 10:00 p.m. that evening, the defendant and Mr. Green arrived at the police station. Lieutenant Dyer testified that he recalled thinking that the clothing of the defendant and Mr. Green was consistent with the clothing of the

passengers who fled the Maxima earlier in the day, particularly in that it looked tattered, as though they had run through a brushy area. Detective Haney testified that the two came to the back gate, which was a secure location. Mr. Green and the defendant were interviewed individually and together. Detective Haney testified that the defendant did not appear intoxicated. He acknowledged that the defendant stated he had smoked marijuana earlier but reiterated that the defendant "appeared to be fine." Detective Haney also stated that the defendant at one point stated he had taken Xanax, but he denied that the defendant appeared intoxicated. Initially, both the defendant and Mr. Green implicated "Chaw." A redacted video recording of the interview was played for the jury.

During the first interview, the defendant denied any involvement with the crime. In reviewing the rights waiver, the defendant spoke indistinctly as he partially read the waiver aloud. After signing it, he told police that he had heard that "Chaw" committed the crime. The defendant and Mr. Green were then interviewed together. The defendant initially denied participating in the robbery. To elicit a confession, detectives told the defendant that the burning of the Solara had been captured on video. The defendant then admitted being involved in the burning of the car, stating that he was the lookout. He eventually acknowledged being at the scene of the robbery but continued to implicate "Chaw" as the shooter. The defendant stated that he saw the victim handing his possessions to "Chaw" and agreed with the suggestion that the victim ran into the path of the bullet. The defendant and Mr. Green were told that they were being charged with criminal homicide, as were Ms. Adcock and Ms. Williamson. Realizing that he would be facing homicide charges and that the charges would not change, the defendant asked, "Okay, how did we get down here?" The defendant asked officers to call his father and tell his father what was happening. During the interview, the defendant numerous times asked about his case, the charges, the type of homicide, potential sentences, his bond, and his destination in the criminal justice system. After police repeatedly urged him to show remorse and be honest, he was asked if he meant to shoot the victim or if it was to scare him, and the defendant answered, "The second one." The defendant ultimately admitted shooting twice and said he did not aim at the victim. He acknowledged having heard Ms. Adcock planning the crime. After implicating himself, the defendant asked to call his mother. After confirming that he would be charged with homicide, the defendant said, "Shoot me in my head."

At the conclusion of the joint interview, the defendant, Mr. Green, and Mr. Wilson were left alone in a room. The discussion mainly centered around the consequences which Mr. Green and the defendant might face for their actions and speculation on the fact that the two women had implicated them in the crime. Mr. Green told the defendant, "you shouldn't have shot." The defendant responded, "I didn't try to." Mr. Green then reiterated, "You already had him. He was gone. Why shoot for, man?" Mr. Green expressed his belief that he should not "even be right here." The defendant told his friends that he "tried to put it on Chaw." The three discussed the gun, and Mr. Wilson told his friends, "I threw it on the side." Mr. Green also commented that the Maxima was "the car we done everything in." In discussing the

7

potential punishment, the defendant then said,

> Defendant: It ain't like it was up close and personal, but—you feel me—it was like, 'Boom, boom.' They know that. That's why I shouldn't have been talking around them.

> Mr. Wilson: Around who?

> Defendant: I shouldn't have never said, "I hit him."

> Mr. Green: Around Tara? ... You know you hit him, though, bro. You, man.

In addition to the physical evidence collected as described above, Tommy Simpkins attempted to recover evidence from inside the burned Solara and the Maxima. In the Solara, Officer Simpkins found latex gloves. He was able to recover some fingerprints from the Maxima and Solara and from various items inside the cars. Officer Stanley Truitt testified that police also attempted to recover evidence from a white Chevrolet. A red gas can was recovered from the back seat.

Lisa Addleman completed the fingerprint comparisons for the investigation. Ms. Addleman was given known prints from the four co-defendants, as well as the prints of Mr. Wilson, Mr. Johnson, Ms. Williamson's nephew, and the victim. Many of the fingerprints that had been retrieved as evidence were of no value. However, she was able to identify Ms. Williamson's fingerprints on the box of Winchester ammunition recovered from the kitty litter. The Maxima had fingerprints from Mr. Johnson and Mr. Green. From the victim's burnt car, she identified three fingerprints belonging to Mr. Green. Finally, she was able to identify the defendant's fingerprints on a box of condoms and on a CD, both of which were recovered from the Maxima.

The State also presented the testimony of David Kline from the city planning department. Mr. Kline testified that the gas station where the victim met Ms. Adcock, the home of Ms. Adcock, the home of Mr. Green, the crime scene, the road where the vehicle was burned, and the road where the Maxima collided with the other vehicle were all within one and a half miles of one another. Detective Kautzman testified that telephone records show that on the day of the murder, there were ten communications between the victim and Ms. Adcock, ranging in time from 4:00 p.m. to 8:01 p.m. There were also numerous telephone communications between Ms. Adcock and Mr. Green beginning on the afternoon of March 28th and going through the next morning. Detective Kautzman acknowledged that at one point, the video failed during the interviews.

The defendant attempted to show that the shooter might have been Ms. Williamson and that the other co-defendants implicated him because he was not well acquainted with them. The defense presented the testimony of Gary Wilkes, who had been at a nearby business and had witnessed Ms. Adcock and Ms. Williamson interact with

the victim. Mr. Wilkes testified that Ms. Williamson "looked like a boy." The defendant also called Rodney Foster, who was a supervisor at the juvenile detention center where the defendant was housed subsequent to his confession. Mr. Foster testified that the defendant seemed "kind of high" and told him that he had taken Xanax. As a result of this communication, Mr. Foster called the nurse. The nurse instructed him to put the defendant on observation for the night, waking him every thirty to forty minutes. Mr. Foster acknowledged that the defendant was not staggering and that he was responsive. The defendant followed directions and was able to undress and shower. The defendant was "blabbering" and talking quickly, and Mr. Foster could "tell that he was high." The defendant tried to talk to Mr. Foster about why he was there, but Mr. Foster stopped him. Mr. Green was present during trial, but the defendant ultimately elected not to call him as a witness.

*Tennessee v. Buford*, 2015 WL 9488975, at *1-6.

### A.    Procedural History

### 1.    Conviction and Sentencing

After his trial, a Davidson County jury convicted Mr. Buford of one count of felony murder, one count of especially aggravated robbery, and one count of tampering with evidence. *Tennessee v. Buford*, No. M2014-01265-CCA-R3-CD, 2015 WL 9488975, at * 7 (Tenn. Crim. App. Dec. 29, 2015), *perm. appeal denied*, (Tenn. May 6, 2016); Docket No. 9-1, pp. 95-96. After a sentencing hearing, the Court ordered the convictions for especially aggravated robbery and tampering with evidence be served concurrently with the conviction for first degree felony murder, for an effective sentence of life with the possibility of parole. *Id.*

On December 16, 2013, Mr. Buford filed a motion for new trial based on the following:

1.    That this Honorable Court in Count One (1), should grant the Motion as a thirteenth juror because the State failed to prove, beyond a reasonable doubt, that the Defendant was guilty of Felony Murder.

2.    That this Honorable Court in Count Two (2), should grant the Motion as a thirteenth juror because the State failed to prove, beyond a reasonable doubt, that the Defendant was guilty of Especially Aggravated Robbery.

3.    That this Honorable Court in Count Three (3), should grant the Motion as a thirteenth juror because the State failed to prove, beyond a reasonable doubt,

9

that the Defendant was guilty of Tampering with Evidence.

4.    That this Honorable Court in Count One (1), should grant the Motion because the State failed to present sufficient evidence that the Defendant was guilty of Felony Murder.

5.    That this Honorable Court in Count Two (2), should grant the Motion because the State failed to present sufficient evidence that the Defendant was guilty of Especially Aggravated Robbery.

6.    That this Honorable Court in Count Three (3), should grant the Motion because the State failed to present sufficient evidence that the Defendant was guilty of Tampering with Evidence.

7.    Suppression of Statement Denied (12-18-12) (orally addressed at new trial hearing)

Docket No. 9-1, pp. 109-10. The trial court denied his request for relief on January 30, 2014.

Docket No. 9-1, pp. 111.

## 2.    Direct Appeal

Mr. Buford appealed his conviction to the Tennessee Court of Criminal Appeals, which

appeal was denied on December 29, 2015. *Tennessee v. Buford,* No. M2014-01265-CCA-R3-CD,

2015 WL 9488975, at *11 (Tenn. Crim. App. Dec. 29, 2015), *perm. app. denied* (Tenn, May 6,

2016); Docket No. 9-17, 9-19. The Tennessee Criminal Court of Appeals summarized the issues

Mr. Buford raised on appeal as follows:

The defendant asserts that the trial court erred in denying his motion to suppress his statement to the police. He also urges us to conclude that the evidence was insufficient to support this convictions because the testimony of a co-defendant was insufficiently corroborated.

*Id*. at *1.

The Tennessee Court of Criminal Appeals affirmed his conviction and sentence. *Id.* Mr.

Buford then filed for permission to appeal to the Tennessee Supreme Court, but the Tennessee

Supreme Court declined to review Mr. Buford's case in an order issued on May 6, 2016. Docket

No. 9-21.

### 3.    State Post-Conviction Proceedings

Mr. Buford timely filed a *pro se* Petition for Post-Conviction Relief with the Davidson County Criminal Court Clerk's Office on March 2, 2017. Docket No. 10-1, pp. 31-39. Mr. Buford's claims for relief based on ineffective assistance of counsel in the petition are as follows:

#### PRE-TRIAL SUPPRESSION HEARING

a.    Defense counsel did not properly investigate and prepare for the Pre-Trial Suppression Hearing and as a result, did not call witnesses who could have testified about my condition prior to my interrogation, and was not prepared for direct and cross-examination of witnesses; all of which hampered my defense at trial in this matter and deprived me of my right to the effective assistance of counsel under Art. I, § 9 of the Constitution of Tennessee and the 6th Amendment of the Constitution of the United States.

i.    I was underage and a legal juvenile, and I repeatedly demanded for both of my parents to be present at my interrogation.

ii.    The only witness against me at the motion to suppress was a police officer who denied my requests to have my parents present at my interrogation, and was directly responsible for violating my constitutional and statutory rights as an accused, whose statement was an uncorroborated recitation of an unconstitutional interrogation, coerced of an underage defendant who was under the influence of drugs at the time of the interrogation.

iii.    My counsel failed to call other witnesses to corroborate my suppression motion, and was ineffective in failing to impeach the police detective due to lack of preparation and investigation which would have uncovered facts supporting my motion to suppress.

#### TRIAL PREPARATION

(b) Defense counsel did not properly investigate and prepare for the trial in this matter and as a result, employed seriously defective trial strategy, and was not prepared for direct and cross-examination of witnesses; therefore, he hampered my defense in this matter and deprived me of my right to the effective assistance of counsel under Art. I, § 9 of the Constitution of Tennessee and the 6th Amendment of the Constitution of the United States.

(c) Trial counsel failed to call witnesses who would have impeached the only testimony against me of impact – the uncorroborated testimony of a co-defendant, Tara Adcock. Trial counsel was aware of a deal between police and Ms. Adcock for favorable treatment, and failed to impeach Ms. Adcock adequately with countervailing testimony of other available witnesses.

(d) Trial counsel failed to call witnesses who would have testified that I was not the shooter, and that I was the victim of a conspiracy to place the entire blame of the killing on me, a juvenile with no prior contacts with the actual mastermind of the crime, Tara Adcock, who admitted the orchestration of the crime and doing it for financial gain.

(c) During closing arguments, defense counsel lessened the burden of proof for the state by stating: 'they have the burden of proving and convincing you to find this man guilty beyond a reasonable doubt and to a moral certainty of felony murder, …' which is contrary to an cannot be reconciled with the United States Supreme Court's decisions in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) and *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) Therefore, he hampered my defense in this matter and deprived me of my right to the effective assistance of counsel under Art. I, § 9 of the Constitution of Tennessee and the 6th Amendment of the Constitution of the United States.

(d) Counsel did not adequately relay plea offers to me.

(e) I was denied the effective assistance of counsel because trial counsel failed to designate and include a copy of the suppression hearing in the record on appeal, including video tapes of the entire interrogation. This error was instrumental in failing my appeal, as the Court of Criminal Appeals specifically pointed out that their review of the suppression motion was limited by the error of trial counsel to include these important aspects of the record on appeal.

(f) Appellate counsel, Carrie A. Lowery, was unable to fully articulate the issues on appeal contained within my petition on appeal because of trial counsel's failure to include the entire record, most saliently the suppression hearing, on appeal. Had the record been fully sent to the Court of Criminal Appeals by my trial counsel, including the videos of the interrogation, it is highly likely the incriminating statements would have been suppressed. These statements were highly prejudicial to the Defendant, and had they been excluded, it is highly likely the outcome at trial would have been different.

*Id*. at pp. 33-37.

Ryan Caldwell was appointed as post-conviction counsel on March 29, 2017. Docket No.

10-1, pp. 40. Subsequently, Mr. Buford retained Wesley Clark and Frank Brazil to represent him

on this petition. *Id*. at pp. 41-42. With the help of counsel, Mr. Buford filed an amended petition for post-conviction relief on January 19, 2018. *Id*. at pp. 43-49. The amended petition incorporated by reference all paragraphs of his March 2, 2017, Petition for Post-Conviction relief, and summarized his allegations as follows:

> Mr. Buford was rendered ineffective assistance of counsel, both at trial and on appeal, in violation of the Sixth and Fourteenth Amendments to the United States Constitution. As a result, Mr. Buford's rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution were violated without redress. Mr. Buford's conviction hinged on the admission of incriminating statements during police interrogation. Earlier that day, Mr. Buford took Xanax bars and smoked Marijuana. Detective Haney conducted a custodial interrogation of Mr. Buford, a minor, in violation of the right to Due Process and the Fifth Amendment privilege against self-incrimination.

*Id.* at pp. 43, 46-47.

The amended petition further specified Mr. Buford's ineffective assistance of counsel claims at various stages of litigation as follows:

**Trial Counsel**

(18) Attorney Elaine Heard was appointed to represent Mr. Buford following his arraignment.

(19) Kelly Young represented Mr. Buford on his Motion to Suppress, which was heard on December 12, 2012.

(20) Communication was sparse and difficult. Attorney Heard visited with Mr. Buford in jail only twice. She never reviewed discovery in the case with Mr. Buford. Mr. Buford and Ms. Heard never had a working attorney/client relationship, and Mr. Buford lacked confidence in her abilities based on the obvious deficiencies in the performance of her professional duties.

(21) Mr. Buford fired Ms. Heard and on September 1st, 2013, retained private counsel to represent him, Kelvin Jones.

(22) However, the Court refused to relieve Ms. Heard of the representation and Ordered that she remain on as counsel for Mr. Buford during the trial.

(23) No one explained the elements of felony murder to Mr. Buford pre-trial, and Mr. Buford had no understanding of what the state needed to do to prove guilt.

(24) On September 23, 2013, the trial Court held a pretrial motion hearing. Counsel for the Defendant Mr. Jones stated to the court that, as a result of recent jailhouse calls, there were over seventy files which he had not reviewed. Counsel requested a continuance but was denied.

(25) Mr. Buford was forced to trial without adequate time for his new lawyer to prepare.

(26) During the trial, Detective Haney's testimony did not line up with his prior testimony at the December 18, 2012, hearing on the Motion to Suppress.

(27) Trial counsel failed to have a transcript prepared from that hearing and, therefore, was unable to effectively cross-examine the most critical witness in the case.

**Appellate Counsel**

(28) As an additional ground for relief, Mr. Buford would show that appellate counsel failed to complete the record with a transcript of the hearing on Mr. Buford's Motion to Suppress from December 18, 2012. The primary basis for the appeal was the violation of Mr. Buford's Fifth Amendment privilege against self-incrimination and his Fifth and Sixth Amendment right to counsel during the interview with Detective Haney. *See* [Tennessee] v. Buford, No. M201401265CCAR3CD, 2015 WL 9488975,at *8 (Tenn. Crim .App. Dec. 29, 2015).

(29) By failing to complete the record on appeal, appellate counsel left Mr. Buford utterly defenseless against the constitutional violations that occurred during his trial. The results were obviously catastrophic. "We note here that the appellant has the duty to provide a transcript as necessary to permit the appellate court to conduct a review. Tenn. R. App. P. 24(3)." Id. at *8. "Generally, where the has the duty to provide a transcript as necessary to permit the appellate court to conduct a review. Tenn. R. App. P. 24(b)." Id. at *8. "Generally, where the appellant fails to submit a complete record, the trial court's determinations are presumed correct." Id

*Id*. at pp. 46-48.

With help from counsel, Mr. Buford filed a second amended petition for post-conviction relief on April 10, 2018. Docket No. 10-1, pp. 52-59. The second amended petition incorporated all paragraphs of his March 2, 2017, Petition for Post-Conviction relief and summarized his claims for relief as follows:

Mr. Buford was rendered ineffective assistance of counsel, both at trial and on appeal. As a result, Mr. Buford's rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution were violated by Detective Haney

and the State of Tennessee without redress. Mr. Buford's conviction hinged on the admission of incriminating statements made during the policy interrogation while Mr. Buford was intoxicated by alprazolam and marijuana. Detective Haney conducted that custodial interrogation of Mr. Buford, a minor, in violation of the rights guaranteed to him by to the United States Constitution, including the right to Due Process, the Fifth Amendment privilege against self-incrimination, and the Sixth Amendment right to counsel.

*Id*. at pp. 52, 55.

Mr. Buford's second amended petition reiterated Paragraphs 18-29 of his first amended petition, in addition to adding the following claims in regards to trial counsel:

(25) None of Mr. Buford's attorneys raised the argument that, because Mr. Buford requested counsel at the beginning of the interview with Det. Haney, his Sixth Amendment right to counsel was violated.

(26) Mr. Buford was never again offered counsel, and he was too impaired by the alprazolam he admitted to taking earlier in the day to knowingly or voluntarily waive any constitutional rights…

(31) Additionally, none of Mr. Buford's trial counsel obtained an expert witness to testify regarding the impact of alprazolam on his ability to consent or waive any of his constitutional rights during the recorded police interview.

*Id.* at 46-48, 55-57.

After a tri-furcated hearing on September 28, 2018, November 28, 2018, and December 14, 2018, the post-conviction court denied post-conviction relief in February 2019, finding Mr. Buford was not deprived of his constitutional right to effective assistance of counsel. Docket No. 10-1, pp. 65-91. Buford then filed a timely notice of appeal of the post-conviction court's order denying his petition for post-conviction relief. *Id*. at pp. 92. In his appeal before the Tennessee Court of Criminal Appeals, he advanced several grievances related to ineffective assistance of trial and appellate counsel. Docket No. 10-10, pp. 2-24. The Tennessee Court of Criminal Appeals summarized Mr. Buford's arguments as follows:

On appeal, the Mr. Buford argues that: (1) his counsel at the suppression hearing was ineffective for failing to put on evidence to corroborate his testimony

concerning his intoxication; (2) his counsels at trial were ineffective for failing to communicate with him, review the transcript from the suppression hearing, and present a cohesive theory of defense; and his appellate counsel was ineffective for failing to include a transcript from the suppression hearing in the record on appeal.

*Buford v. Tennessee*, No. M2019-00424-CCA-R3-PC, 2020 WL 5668034, at *5 (Tenn. Crim. App. Sept. 24, 2020);[2] Docket No. 10-12, pp. 6-7.

The Tennessee Court of Criminal Appeals subsequently affirmed the denial of Mr. Buford's petition for relief. Docket No. 10-12. Mr. Buford appealed to the Tennessee Supreme Court, but his application for permission to appeal was denied. Docket No. 10-18.

### 4. Federal Post-Conviction Proceedings

Mr. Buford initiated this action in April 2021 by filing a petition for writ of habeas corpus under 28 U.S.C. § 2254. Docket No. 1. Buford raised several grounds for relief in his petition alleging his trial and appellate counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution.

(1) Trial counsel's assistance was constitutionally ineffective and the claims of ineffective assistance of counsel are prejudicial.

    a. Trial counsel ineffectively represented him on the issue of suppressing inculpatory statement.
    b. Trial counsel failed to present additional witnesses at the suppression hearing.
    c. Trial counsel failed to argue invocation of rights to counsel in the suppression motion.

(2) Appellate counsel was ineffective for failing to include a transcript of the suppression hearing as part of the appellate record, which prevented effective appellate review.

The State of Tennessee filed the state-court record in April 2022 (Docket No. 9-10), and answered Mr. Buford's petition in May 2022 (Docket No. 13). The State argues that Mr. Buford is not entitled to relief and his petition should be dismissed because Mr. Buford failed to show that

---

[2] The LEXIS reporter citation is *Buford v. Tennessee*, No. 2019-00424-CCA-R3- PC, 2020 Tenn. Crim. App. LEXIS 630 (Sept. 24, 2020).

the Tennessee Court of Criminal Appeals made an unreasonable decision when adjudicating his claims of ineffective assistance of trial counsel for failure to present additional witnesses at the suppression hearing and ineffective assistance of appellate counsel for failure to file a transcript of the suppression hearing. Docket No. 13, p. 2. Furthermore, the State alleges that Mr. Buford's ineffective assistance of counsel claim relating to failure to argue invocation of the right to counsel is procedurally defaulted because Mr. Buford failed to raise the claim on post-conviction appeal, and therefore it should be barred from review. *Id.* Finally, the State argues that Mr. Buford's request for an evidentiary hearing should be denied. *Id.*

Mr. Buford filed a reply in May 2022, in which he maintains he is entitled to relief on each of his claims. Docket No. 14. Mr. Buford contends his claim to relief for failure of trial counsel to argue he invoked his right to counsel prior to his interrogation is not procedurally defaulted because his post-conviction counsel did raise the issue. *Id.* Specifically, trial counsel challenged the propriety of his pre-trial statement to the MPD through his pleadings and challenged the effectiveness of his trial counsel on this issue by alleging his Fifth Amendment rights were violated in post-conviction petition as well as during the evidentiary hearing conducted in State court. *Id.* Furthermore, Mr. Buford argues that if the Court does find this claim to be procedurally defaulted, the Court should excuse it. *Id.*

## II.    LEGAL STANDARD

### A.    28 U.S.C. § 2254(d)

Mr. Buford's petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Section 2254(d) provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)     Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

**B.     Ineffective Assistance of Counsel**

The Supreme Court has noted that, generally, to prove an ineffective assistance of counsel claim, a petitioner must show two things. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, a petitioner must show the deficiency in their counsel's performance. *Id*. To exhibit deficiency, a lawyer must have "made errors so serious that counsel was not functioning as the 'counsel'" the Sixth Amendment guarantees. *Id*. Then, a petitioner must show prejudice caused by the deficient performance. *Id*.

The standard set out in *Strickland* imposes an initial level of deference that is then bolstered by the deference imposed by 28 U.S.C. § 2254(d). *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Accordingly, federal courts are not to analyze whether counsel's actions were reasonable, but instead analyze "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. In other words, a federal court is meant to check that the state court acted reasonably in their decision that trial counsel's performance survived the *Strickland* analysis. *Id*.

**III.     ANALYSIS**

**A.     Ineffective Assistance of Counsel at the Suppression Hearing**

**1.     Exhaustion**

Mr. Buford took his claims of ineffective assistance of his suppression-hearing counsel to the Tennessee Court of Criminal Appeals. *Buford v. Tennessee*, No. M2019-00424-CCA-R3-PC,

18

2020 WL 5668034, *5 (Tenn. Crim. App. Sept. 2020). The state appellate court considered the multiple claims regarding Mr. Buford's ineffective assistance of counsel, one of which included counsel's performance at the suppression hearing. *Id*. Specifically, that "[Mr. Buford's] counsel at the suppression hearing was ineffective for *failing to put on evidence to corroborate his testimony concerning his intoxication*." *Id* (emphasis added).

The Tennessee Court of Criminal appeals reviewed the lower court findings *de novo* as ineffective assistance of counsel arguments required the court to consider mixed questions of law and fact. *Id*. But still, the appellate court will usually provide a presumption of correctness for the lower court's factual findings. The Tennessee Court of Criminal Appeals dealt with all issues presented on their merits and affirmed the post-conviction hearing court's findings and maintained Mr. Buford's sentence as it was imposed.

However, Mr. Buford has a second issue with his counsel's performance at the suppression hearing—counsel did not argue for suppression based on Mr. Buford's alleged invocation of his right to counsel during the interview. (Docket No. 1, pp. 30). Despite the claim being included in this petition, this claim was not argued before the Tennessee courts. *See Buford v. Tennessee*, 2020 WL 5668034 at *3-6. Naturally, the State courts did not address this argument on the merits, and the claim is procedurally defaulted. Therefore, without a proper excuse, relief cannot be rewarded on this claim.

### 2.    Excusing Default

In order for Mr. Buford's second claim to be considered, there must be a valid excuse for the procedural default. Excusing procedural default requires that there be a "fundamental miscarriage of justice" inflicted on a petitioner without considering the merits of the claim. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To find a proper excuse, the Supreme Court

held that a petitioner must show an "objective factor external to the defense impeded counsel's efforts" to follow proper procedures set out by the state. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Several considerations influence the determination on whether a procedural default is excused. Factors for finding valid excuses include: (1) the factual or legal basis for a claim was not reasonably available to counsel, and (2) interference by officials made compliance impracticable. *Id*. Of course, showing new evidence exonerating a petitioner by proving their "actual innocence" would also excuse procedural default. *Hodges v. Colson*, 727 F. 3d 517, 530 (6th Cir. 2013). Overall, the focus of the analysis is whether the petitioner can show cause for the failure to raise the issue in state courts with the prejudice inflicted on the petitioner. *See Coleman*, 501 U.S. at 750; *Moss v. Miniard*, 62 F. 4th 1002, 1011 (6th Cir. 2023).

Here, there is no proper excuse for the procedural default. Essentially, Mr. Buford's argument boils down to post-conviction counsel recognizing an error under the wrong theory. As Mr. Buford notes, "[his] post-conviction counsel raised this issue . . . but styled it as a violation of Mr. Buford's 6th Amendment right to counsel." (Docket No. 1, pp. 31). This sentence acknowledges the factual and legal basis for the claim were available at the time. Furthermore, Mr. Buford does not argue there was interference by officials or new evidence that warrants a finding of his "actual innocence." *Hodges*, 727 F. 3d at 530. Thus, the procedural default cannot be excused.

Even if the procedural default was excused, Mr. Buford would still not be entitled to relief. Mr. Buford's evidence of invoking his right to counsel is interrupting the explanation of his *Miranda* rights with the question "[r]ight now?" (Docket No. 1, pp. 31). Although it is clearly established law that a suspect who has invoked a right to counsel cannot be questioned further,

*Davis v. United States*, 512 U.S. 452, 458 (1994) (citing *Minnick v. Mississippi*, 498 U.S. 146 (1990)), the rule's application hinges on an objective determination that "the accused *actually invoked* his right to counsel." *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (emphasis added); *see also Connecticut v. Barret*, 479 U.S. 523, 529 (1987). The Supreme Court has held that if "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, . . . precedent do[es] not require the cessation of questioning." *Davis*, 512 U.S. at 459 (emphasis original). In other words, the request for counsel must be unambiguous. *Id*.

Here, Mr. Buford simply asked a question, (Docket No. 1, pp. 31), which is a far cry from the unequivocal invocation the Supreme Court's precedent instructs this Court to look for. *Davis*, 512 U.S. at 459. Indeed, by Mr. Buford's own account, his question did not even arise during questioning, but rather during the *Miranda* warning process. Docket No. 1, pp. 31. According to Mr. Buford, the officer asked for him to not talk until after the full warning was read. *Id*. The officer's request makes sense, one would want the suspect to listen carefully to their *Miranda* rights so they know what can be invoked and when they may do so. Mr. Buford then did not bring the desire to get an attorney for the interrogation process back up, and it is not an officer's job to invoke constitutional rights for suspects. Accordingly, even if the Court did consider this claim on its merits, Mr. Buford would not be granted relief.

### 3. Merits

Moving to the merits of non-procedurally defaulted claims, Mr. Buford puts forth several alleged instances to show ineffective assistance of trial counsel and argue for habeas relief, but none prevail over the "'doubly' deferential" analysis imposed on federal courts for habeas proceedings. *Jackson v. Houk*, 687 F. 3d 723, 740-41 (6th Cir. 2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)). Again, this court's role is not to check to see whether the

*Strickland* standard was satisfied, but rather to see if the state appellate court was reasonable in saying that trial counsel's assistance was adequate. *Richter*, 562 U.S. at 105.

Mr. Buford puts forth the argument regarding his counsel's allegedly deficient performance. *Buford v. Tennessee*, No. M2019-00424-CCA-R3-PC, 2020 WL 5668034, at *1 (Tenn. Crim. App. Sep. 24, 2020). Specifically, Mr. Buford claims that "his counsel at the suppression hearing was ineffective for failing to put on evidence to corroborate his testimony concerning his intoxication." *Id*. However, the Tennessee Court of Criminal Appeals was reasonable in finding Mr. Buford's representation at the suppression hearing adequately conformed to the requirements of the Sixth Amendment to the United States Constitution.

The appellate court addressed the argument by considering testimony from Mr. Buford's witnesses from his post-conviction hearing. *Id*. Dr. James Walker stated that the substance Mr. Buford alleges was in his system could have disabling effects more potent than alcohol but a tolerance can be developed over time. *Id*. at *2. The appellate court noted that Dr. Walker "never met with the Mr. Buford" but instead "reviewed the videotape" of the confession. *Id*. Dr. Walker was unable to discern whether Mr. Buford was actually under the influence or whether he was incapacitated during the interrogation. *Id*. Mr. Rodney Foster, from the juvenile detention center, also testified. *Id*. He noted he could remember testifying at trial that Mr. Buford seemed intoxicated when initially brought in. *Id*.

Counsel for Mr. Buford's suppression hearing said that he did not consider calling an expert to testify because "he was not aware of any medical way that Mr. Buford's level of intoxication at the time of the confession could be determined." *Id*. at *3. Suppression counsel then noted that calling an expert to examine the video may have been helpful. *Id*.

The first trial counsel testified that she did not reconsider moving to suppress the

confession because the issue had already been decided. *Id*. When asked whether counsel for the suppression hearing should have called an expert, trial counsel said she could not recall an instance where she had called one. *Id*. She further elaborated on her trial strategy as trying to avoid bringing attention to the taped confession, which led her to not call a medical expert for trial. *Id*. To her, the strategy prevented "the jury [from] spend[ing] hours and hours and days listening to my client[] confess to murder." *Id*. First trial counsel also noted her experience with Dr. Walker in the past, and explained she "would probably not hire him again." *Id*. (internal quotations omitted).

Second trial counsel's testimony was also considered. *Id*. at *4. He noted that "it appeared suppression counsel did a pretty decent job" in litigating the motion to suppress the confession. *Id*. Although second trial counsel thought the medical expert testimony would have been useful, he had never used one under similar circumstances himself. *Id*.

Finally, appellate counsel's testimony was considered as well, which included her personal opinion, based solely on viewing the confession video and no special education or training, that Mr. Buford was "very clearly . . . intoxicated" during the interrogation. *Id*.

The Tennessee Court of Criminal Appeals echoed the post-conviction court's findings— Mr. Buford failed to establish both deficient performance and prejudice. *Id*. at *6. Specifically, the Tennessee Court rested on the fact that, although Dr. Walker and Mr. Foster's testimony may have been helpful at the suppression hearing, counsel's argument as it was presented "adequately supported his contention that Mr. Buford was intoxicated." *Id*.

This Court finds that the conclusion of adequate counsel for the suppression hearing by the Tennessee Court of Criminal Appeals is reasonable. Afterall, there was no medical way to concretely prove Mr. Buford was so intoxicated as to invalidate the confession, as Dr. Walker admitted. *Id*. at *2. Although Mr. Foster corroborated such an argument to a degree, *Id*., his

testimony was also consistent with a conclusion that Mr. Buford was adequately aware of his surroundings to be "capable of narrating events and that he was not so intoxicated that his confession was not of a free mind or rational intellect." *Id*. at *6.

Furthermore, the two different trial attorneys agreed on the suppression motion being adequately litigated in light of their typical practices. *Id*. at *3-4. Although they conceded of the possibility of medical experts being helpful, neither could recall using that tactic in suppression hearings. *Id*. at *3-4. Even though the strategy employed at the suppression hearing may not have been the optimal one, there is a reasonable argument that it does not fall below the line set out by the Supreme Court in *Strickland*.

Accordingly, Mr. Buford is afforded no relief on this claim as the Tennessee Courts' holdings do not contravene federal law.

### B.    Ineffective Assistance of Appellate Counsel

### 1.    Exhaustion

Mr. Buford also raised this claim in the state post-conviction proceedings (*see* Docket No.10-1, pp. 36-37, 47-48, 57), and appealed the denial of his claim from the trial court to the Tennessee Court of Criminal Appeals. *See* Docket No. 10-12. The Tennessee Court of Criminal Appeals reviewed and denied his claim on the merits. *Id*. Therefore, Mr. Buford has fully exhausted this claim in the available state proceedings.

### 2.    Merits

Mr. Buford argues that he received ineffective assistance of appellate counsel when his counsel "failed to include the transcript of the suppression hearing in the appellate record," which therefore prevented "the appellate court from properly reviewing the suppression issues raised by Mr. Young and denied by the post-conviction court." Docket No. 1, p. 33. Mr. Buford claims this

was "clearly deficient performance on the part of appellate counsel," and this caused prejudice, satisfying the second prong of *Strickland v. Washington*, because "he was entirely deprived of a complete and accurate appellate review of this issue during his initial appeal." Docket No. 1, p. 33; *Strickland v. Washington*, 466 U.S. 668 (1984).

In support of this argument, Mr. Buford points to Ms. Lowery's testimony at the evidentiary hearing held by the post-conviction court on December 14, 2018. Docket No. 1, p. 19-20. Mr. Buford states that Ms. Lowery testified she thought there were problems with Mr. Buford's "'alleged-so-call confession'" and believed Mr. Buford appeared intoxicated after her review of the videotape of Mr. Buford's statement to the MPD. *See* Docket No. 1, p. 19. Though she had no training in psychology or substance abuse, she testified, "[i]n he professional opinion, medical proof related to Xanax and its effects on his [Mr. Buford's] ability to knowingly and intelligently waive his 5th Amendment rights would have been helpful for Mr. Buford's case had it been presented at the suppression hearing." *Id.* Furthermore, she "acknowledged that she failed to include a transcript of the suppression hearing in the record on appeal and that it would have bene helpful to include one for better appellate review of the trial court's decision to deny the motion." *Id.*

The State argues that the Court of Criminal Appeals did not unreasonably apply clearly established federal law in Mr. Buford's case. Docket No. 13, p. 23. In support of this argument, the State claims that Mr. Buford has not shown the state courts unreasonably applied the *Strickland v. Washington* standard for analyzing ineffective assistance of counsel claims. *Id.*; *see Strickland v. Washington,* 466 U.S. 668 (1984). According to the State, "[t]he Court of Criminal Appeals properly identified the controlling federal law, *Strickland*, and determined that Mr. Buford failed to prove prejudice." Docket No. 13, p. 23 (citing *Buford v, Tennessee*, 2020 WL 5668034, at *7-

8). The State claims the Court of Criminal Appeals, on direct appeal, "gave the trial court's findings of fact and presumption of correctness, but also considered the videotape of Mr. Buford's interview with police, and the evidence from trial," concluding that "was clearly an adequate basis for rendering a decision on the issue [of prejudice]." *Id.* (citing *Tennessee v. Buford*, 2015 WL 9488975, at *8-9). Because the trial court's findings summarized the testimony (Docket No. 9-1, pp. 21-23), the videotape recorded the confession at issue, and Mr. Foster testified at trial (Docket No. 9-6, pp. 13-26), the State argues "[t]he determination that prejudice did not result from the lack of a transcript on appeal is not so lacking in justification as to warrant relief." *Id.* Therefore, the State concludes that "Mr. Buford cannot show prejudice, and the decision of the Court of Criminal Appeals in reasonable." *Id.*

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686-687 (1984). The right to effective assistance of counsel extends to representation in a direct appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 398 (1985). To substantiate a claim that his counsel was ineffective, a Mr. Buford must prove: (1) that his "counsel's performance was deficient" and (2) that his counsel's "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "Unless a [Mr. Buford] makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

In establishing that Mr. Buford's counsel was deficient, it must be shown that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to Mr. Buford] by the Sixth Amendment." *Id.* In other words, counsel's performance must have fell "'below an objective standard of reasonableness.'" *Campbell v. Coyle*, 260 F. 3d 531, 551 (6th Cir. 2001)

(quoting *Strickland*, 466 U.S. at 688). The standard for measuring performance under the deficiency prong is "'reasonableness under prevailing professional norms.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). Measuring counsel's performance requires deference to be given to counsel's decisions, including "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Accordingly, Mr. Buford "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). An ineffective assistance of counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken. *Coyle*, 260 F. 3d at 551 (quoting *White v. McAninch*, 235 F. 3d 988, 995 (6th Cir. 2000)).

Further, proving prejudice to the defendant "requires showing that counsel's errors were so serious as to deprive [Mr. Buford] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. In other words, Mr. Buford must show "by 'a reasonable probability that, but for counsels' errors, the result of the proceeding would have been different.'" *Sylvester v. United States*, 868 F. 3d 503, 511 (6th Cir. 2017) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In making this showing, "[i]t is not enough for the [Mr. Buford] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. "A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695.

Although, Mr. Buford would not have to demonstrate prejudice under *Strickland* in three categories of error in which prejudice is presumed: (1) when the right to counsel is denied; (2) when the state interferes "with counsel's assistance;" and (3) when "counsel is burdened by an

actual conflict of interest" so long as the Mr. Buford shows "the conflict adversely affected his counsel's performance." *Smith v. Robbins*, 528 U.S. 259, 287. Under these circumstances, "prejudice . . . is so likely that case-by-case inquiry into prejudice is not worth the cost." *Strickland*, 466 U.S. at 692.

Aside from these three claims, a "general requirement that the defendant affirmatively prove prejudice" is the standard for actual ineffectiveness claims alleging a deficiency in attorney performance. *Id.* at 693. It is not enough for the defendant to show the errors had "some conceivable effect on the outcome of the proceeding," the defendant instead must show the particularly unreasonable errors of counsel "*actually* had an adverse effect on the defense." *Id.* (emphasis added). Therefore, to prove prejudice, Mr. Buford must establish that his appellate counsel's errors were so egregious that they "undermine confidence in the outcome" to a degree that is "sufficient to undermine confidence in the outcome." *Id.* at 694.

In the present case, Mr. Buford has not demonstrated that the state courts unreasonably applied or contradicted clearly established federal law in adjudicating his claims. *See* 28 U.S.C. § 2254(d)(1). After an evidentiary hearing, the Criminal Court for Davidson County found Mr. Buford's appellate counsel to have provided deficient performance under the first *Strickland* prong because Ms. Lowery's failure to includShinne a copy of the hearing of the motion to suppress in the appellate record "f[ell] below the range of competence expected of an appellate attorney." *Buford v. Tennessee*, No. M2019-00424-CCA-R3-PC, 2020 WL 5668034, at *8 (Tenn. Crim. App. Sept. 24, 2020).

But under the second *Strickland* prong, the Criminal Court for Davidson County found that Mr. Buford "failed to establish that he was prejudiced" because he could not demonstrate that the outcome of his direct appeal would have been different had counsel included the transcript. *Id.*,

Docket No. 10-1, p. 90-91. The post-conviction court further elaborated that even though the Court of Criminal Appeals presumed the trial court's finding to be correct due to not having a copy of the transcript, such a presumption did not preclude the Court of Criminal Appeals from conducting a thorough review of the trial court's findings. Docket No. 10-1, p. 90. The lack of the motion to suppress hearing transcript did not prevent the Court of Criminal Appeals, on direct appeal, from reviewing a "thorough summary of the evidence" presented at the hearing on the motion to suppress. *Id.* at p. 91. The post-conviction court stated:

> In affirming this Court's denial of the Mr. Buford's motion to suppress, the Court of Criminal Appeals considered the findings of this Court, the two videos of the Mr. Buford's interviews and the accompanying unofficial transcripts of those videos, and the testimony of Mr. Foster.

*Id.* at p. 90.

Thus, the post-conviction court concluded this was sufficient to show there was nothing in the Criminal Court of Appeals' decision would have been different had the transcript been provided. *Id.* In his petition, Mr. Buford does not explain how he experienced prejudice, nor does he argue how the state courts' adjudication of his claim unreasonably applied or contradicted the *Strickland* standard. *See* Docket No. 1, p 33. Instead, he argues prejudice is presumed where an appellate attorney fails to include the transcript of the suppression hearing in the appellate record because it completely deprives the Defendant of accurate appellate review. *Id.*

Mr. Buford's argument that prejudice should have been presumed in the state courts' analysis of his *Strickland* claim must fail. Mr. Buford argues that Ms. Lowery's failure to include the transcript of the suppression hearing in the appellate record prevented the court from properly reviewing the suppression issues, which prejudiced Mr. Buford by "entirely depriv[ing him] of a complete and accurate appellate review during his initial appeal." Docket No. 1, p. 33. As the Court of Criminal Appeals noted, the trial court included a "thorough summary of the evidence"

presented at the hearing on the motion to suppress on direct appeal. *Buford v. Tennessee*, No. M2019-00424-CCA-R3-PC, 2020 WL 5668034, at *8 (Tenn. Crim. App. Sept. 24, 2020) (internal quotations omitted).

Accordingly, Mr. Buford has not shown how failure to include the hearing transcript in the record constituted a complete denial of accurate appellate review such that prejudice should be automatically presumed. *See Tennessee v. Buford*, No. M2014-01265-CCA-R3-CD, 2015 WL 9488975, at *8 (Tenn. Crim. App., Dec. 29, 2015), Docket No. 10-1, p. 90-91. Because on direct appeal, the Court of Criminal Appeals considered the lower court's findings, which "included a 'thorough summary of the evidence,' the two videos of the Mr. Buford's interviews and unofficial transcripts of those videos, as well as the testimony of Mr. Foster – an officer at the juvenile detention center," which led to the post-conviction court's conclusion that "there is nothing in [the direct appeal] opinion that suggests the decision of the Court of Criminal Appeals might have been different had the transcript been included." *Buford v. Tennessee*, No. M2019-00424-CCA-R3-PC, 2020 WL 5668034, at *8 (Tenn. Crim. App. Sept. 24, 2020).

Since Mr. Buford has not shown that prejudice should have been presumed in his case, the state courts' adjudication of Mr. Buford's claim cannot be construed as contrary to or an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1).

Therefore, Mr. Buford cannot meet his burden under 28 U.S.C. § 2254(d)(1). As a result, Mr. Buford is not entitled to relief on this claim.

### C.    Mr. Buford's Request for an Evidentiary Hearing.

Mr. Buford's request for an evidentiary hearing is denied. The Supreme Court has emphasized strict adherence requirements imposed by AEDPA for expanding on the state-court record with an evidentiary hearing. *Shinn v. Ramirez*, 596 U.S. 366, 371, 142 S. Ct. 1718, 1727

(2022). Only in two "extraordinary" scenarios are evidentiary hearings allowed. *Id.* The first scenario is where the claim relies on "a new rule of constitutional law . . . previously unavailable" but is retroactively applied by the Supreme Court. 28 U.S.C. § 2254(e)(2)(A)(i). The second scenario is where the claim relies on "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A)(ii). Of course, that is not all Mr. Buford needs to show. *Shinn*, 596 U.S. at 371. Additionally, AEDPA requires a showing that the new evidence establish a Mr. Buford's innocence "by clear and convincing evidence" to justify holding an evidentiary hearing. 28 U.S.C. § 2254(e)(2)(B). These conditions, grounded in our dual-sovereignty system, need to be met before a hearing is permitted under federal law. *Shinn*, 596 U.S. at 371, 390.

Here, Mr. Buford cites to no new rule of constitutional law that would apply to his case to allow for an evidentiary hearing under 28 U.S.C. § 2254(e)(2)(A)(i). Indeed, even if he could, it would still need to be ruled applicable retroactively. *Id*. Nothing in the petition indicates that Mr. Buford intends to advance this argument. Furthermore, no new facts have been brought to light to warrant the exception found in 28 U.S.C. § 2254(e)(2)(A)(ii). The crux of Mr. Buford's argument boils down to the interrogation, the arguable invocation of a right to counsel, and alleged (but unproven) intoxication. None of these facts came to light after the state proceedings. *See generally Buford v. Tennessee*, No. M2019-00424-CCA-R3-PC, 2020 WL 5668034 (Tenn. Crim. App. Sept. 24, 2020).

Accordingly, neither exception listed in 28 U.S.C. § 2254(e)(2)(A) is met, and Mr. Buford's request for an evidentiary hearing is denied.

## IV.    RECOMMENDATION

For the reasons discussed above, the undersigned recommends that habeas corpus relief

be **DENIED**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute waiver of further appeal of this Recommendation. *See Thomas v. Arn*. 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**